O’BRIEN, J.,
specially concurring.
Dating back to 1993 Evans enjoyed success in the real estate business. Seeking to capitalize on past success, in 2003 he decided to pursue an ambitious project—buying and refurbishing tired properties and then turning them at a profit. To do so he needed investors. He adequately disclosed the risky nature of the projects to the investors and, to sweeten the deal, offered 12% per annum interest on invested funds. That debt burden, along with other factors, produced disastrous results.
By April 2005, several things became clear: The rehabilitation costs were considerably more than anticipated, the projects were undercapitalized and the interest obligations to investors were disastrously large and unrelenting. As a consequence, the project took on a gloomy countenance, revealing the business model to have been, at best, overly ambitious or, more likely, inherently flawed. None of that, as all agree, amounted to fraud.
Evans was loath to admit the failure of his projects. He confidently thought he could turn things around and, to that end, poured about $4,500,000 of his own funds into them, and manipulated available cash to put out increasingly violent economic fires. But he did not tell the investors. Instead he put a wholesome spin on seriously bad circumstances. While he did so, in part, with the hope of recovery, he intended to mislead them. The true state of affairs came to light in April 2007. As a result, Evans was removed from management of the projects and efforts were made to salvage them. Those efforts were unsuccessful. (Interestingly, the district judge found the value of the properties to have actually increased during the fraud. But, in fairness, the projects’ debt did as well.) Evan’s disinformation campaign was wrong, and fraudulent, as he has candidly admitted. But that still leaves much to be decided. His guilty plea begs a question, the answer to which has resulted in a sentencing dilemma—how does one measure the damages reasonably resulting from the fraud (not being candid with investors), rather than merely estimating the economic losses flowing from a flawed business plan, poor timing and market dynamics? The business loss calculation is relatively easy; arriving at a reasonable estimate of damages is quite difficult, as we have seen.
What are the damages caused by the fraud? Simply stated they are the money investors lost as a result of not having full and timely knowledge of the depth and breadth of the projects’ shortcomings. In other words, what investors additionally lost by being deprived of an opportunity to mitigate foregone losses. But we know one thing: much of the loss had been incurred or was inextricably destined to be incurred before any fraudulent conduct commenced.
The first panel opinion charted the path to resolving the damages dilemma, but it was not followed on remand. It was necessary for the government to produce sufficient evidence from which a reasonable estimate of damages resulting from the fraud could be computed. See USSG *477 § 2B1.1, comment. (n.3(c)). It failed to produce such evidence, saying it was beyond its ken. Faced with a problematic record the district judge undertook an equally problematic differential analysis which neither of the parties adopted (but the government dutifully, albeit reluctantly and ineffectively, pursued). At the end of the day proof of damage was left wanting. That leaves us no choice.
The result here may not be heralded as a model of perfect justice, but it will stand as a conscientious application of the law. I concur in the Order & Judgment.